IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

SALVADOR GONZALEZ,   No. CIV S-08-0173-MCE-CMK-P

    Plaintiff,

  vs.   FINDINGS AND RECOMMENDATIONS

FELKER, et al.,

    Defendants.

_____/

    Plaintiff, a state prisoner proceeding pro se, brings this civil rights action pursuant to 42 U.S.C. § 1983. Pending before the court is defendants' motion for summary judgment (Doc. 60).

/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /

# I. BACKGROUND

## A. Plaintiff's Allegations

This action proceeds on plaintiff's third amended complaint (Doc. 18) against defendants Felker, Foulk, Peery, Lockard, Lynn, Lemon, French, and Miller.[1] Plaintiff states that, on January 16, 2007, correctional officer Sears came to his cell block to escort a prisoner in a neighboring cell to a medical appointment. According to plaintiff, at that time Sears inquired as to "why were the Southerners, Northerners, Whites, and Blacks covering their cell windows." Plaintiff said he didn't know what Sears was talking about. Plaintiff states that, about an hour later, Sears returned, this time with correctional officer Campbell. At that time, Sears told plaintiff: "I guess everyone is mad 'cause of the lockdowns, but they came to an agreement with the Southern Mexicans."

Plaintiff states that, later, he spoke with correctional officer Campbell who said that the guards were upset about the windows being covered earlier and that they wanted to "cell extract" a "Mexican national." He adds that correctional officer Campbell then covered every cell window from the outside and, after that, the electricity and ventilation were turned off. Following this, plaintiff heard "yelling and banging" and he smelled "some type of chemical." Plaintiff states that he has asthma and was having a hard time breathing.

Plaintiff alleges that, several hours later, prison guards arrived in an "aggressive manner" to "cell extract us for no reason." He states that he was falsely accused of covering his cell window. He claims that the guards were angry and disrespectful and that he feared for his safety. Plaintiff says that "[t]his was done under then acting warden Felker, who is legally responsible for the operations" at the prison. Plaintiff states that defendants Foulk, Peery, Lynn,

---

[1] Defendant Peery has not been served. Summons directed to defendant Peery was returned unexecuted due to military deployment. Plaintiff was directed to provide additional information in order to serve defendant Peery and cautioned that failure to do so could result in dismissal of Peery under Federal Rule of Civil Procedure 4(m) for failure to effect timely service of process. To date, plaintiff has not provided any additional information.

Lemon, and Lockard "authorized and supervised the cell extraction."

When the guards came to his cell door to extract him, plaintiff states he felt safer in his cell. He was ordered by defendant Lockard to "turn on my bright lights" and that he complied. He states that, due to noise, he was unable to hear what was being said next, but he assumed he was being ordered to submit to mechanical restraints. Plaintiff alleges that he told the guards that he has asthma, his ankle was sprained, and that he could not hear their orders over the noise. According to plaintiff, "[a]ll of a sudden Sgt. Lemon throws some type of gas grenade in my cell." He states he felt like he was suffocating. He states that when he asked for help, defendants Peery, Lemon, Lockard, and Lynn "all just stared at me as did the rest of the guards." Plaintiff claims he was "forced to go through the naked cell search procedure twice for no reason, but to keep me suffering the effects of the gas longer." He was then "paraded" in front of 50-100 guards and staff, some of whom were female, who were watching and laughing.

According to plaintiff, after being led out of the cell, he was forced to remain naked and in mechanical restraints. Plaintiff states that, during the cell extraction, officer Camire held a shield, Sears and officer Moore held a baton, officer Tampien held handcuffs, officer Ruggero held leg irons, and officer Epperson filmed the incident.[2] He alleges that officer "Doosenberry knew exactly what was going on and let the abuse proceed by opening the cell door from the tower." Plaintiff claims that defendants French and Miller "gave the clearance for me to be gassed and cell extracted, knowing I had asthma and could not be cell extracted in that manner." Plaintiff states that he was then taken to the showers and asked by a nurse if he was okay, to which he responded that he was. However, plaintiff states that he only said he was okay "due to the shock of what had just happened."

/ / /

/ / /

---

[2] These officers were originally named as defendants but have been dismissed.

B. **Defendants' Evidence**

In support of their motion for summary judgment, defendants submit a separate statement of undisputed material facts. This statement is supported by counsel's declaration and the transcript of plaintiff's September 17, 2009, deposition. According to defendants' evidence:

1. A cell extraction occurred on January 16, 2007, at High Desert State Prison;

2. At the time of the extraction, plaintiff was housed in Facility C, Building 6, cell 202;

3. Facility C had been on lock-down status approximately one week prior to the cell extraction, such lock-down prompted by a missing lock;

4. Plaintiff knew that he would be extracted from his cell if he covered the cell window;

5. When officers arrived at plaintiff's cell to extract him, plaintiff was told to turn on the bright light in his cell and plaintiff complied;

6. While plaintiff states that he did not hear anything after that due to banging and commotion, he admits that he assumed he was being told to submit to mechanical restraints when the officers came to his cell;

7. At the time of the extraction, plaintiff was aware of the proper procedures for a cell extraction – back up to the tray slot and submit to handcuffs from behind;

8. Defendant Lemon threw one gas grenade into plaintiff's cell and, following this, plaintiff complained that he could not breathe;

9. Prior to authorizing the use of a gas grenade, defendant Miller reviewed plaintiff's medical records;

10. Following the cell extraction, plaintiff made no medical complaints;

11. Later, while showering, plaintiff told a nurse he was "okay" but also said that his chest was hurting;

12. At the time of the cell extraction, defendant Felker was the acting warden and defendants Foulk and Felker were only involved in the cell extraction to the extent they organized and supervised the process;

13. While Foulk made the decision to go forward with the cell extractions that day, he did not participate in plaintiff's extraction; and

14. Plaintiff admits that no excessive force was used during the cell extraction.

4

## II.  STANDARDS FOR SUMMARY JUDGMENT

Summary judgment is appropriate when it is demonstrated that there exists "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  Under summary judgment practice, the moving party

> . . . always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)).

"[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'" Id.  Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. Id. at 322.  "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id.  In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is satisfied." Id. at 323.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the allegations or denials of its pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists.  See Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 586 n.11.  The opposing party

must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987).

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." T.W. Elec. Serv., 809 F.2d at 631. Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963 amendments).

In resolving the summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any. See Fed. R. Civ. P. 56(c). The evidence of the opposing party is to be believed. See Anderson, 477 U.S. at 255. All reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party. See Matsushita, 475 U.S. at 587. Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. See Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987). Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Matsushita, 475 U.S. at 587 (citation omitted).

/ / /

/ / /

### III.  DISCUSSION

In the third amended complaint, plaintiff alleges Eighth Amendment violations arising from the cell extraction.  Specifically, plaintiff claims that excessive force – particularly the use of a gas grenade – was used during the extraction, and that defendants ignored his pleas for medical attention.  The treatment a prisoner receives in prison and the conditions under which the prisoner is confined are subject to scrutiny under the Eighth Amendment, which prohibits cruel and unusual punishment.  See Helling v. McKinney, 509 U.S. 25, 31 (1993); Farmer v. Brennan, 511 U.S. 825, 832 (1994).  The Eighth Amendment ". . . embodies broad and idealistic concepts of dignity, civilized standards, humanity, and decency." Estelle v. Gamble, 429 U.S. 97, 102 (1976).  Conditions of confinement may, however, be harsh and restrictive.  See Rhodes v. Chapman, 452 U.S. 337, 347 (1981).  Nonetheless, prison officials must provide prisoners with "food, clothing, shelter, sanitation, medical care, and personal safety." Toussaint v. McCarthy, 801 F.2d 1080, 1107 (9th Cir. 1986).  A prison official violates the Eighth Amendment only when two requirements are met: (1) objectively, the official's act or omission must be so serious such that it results in the denial of the minimal civilized measure of life's necessities; and (2) subjectively, the prison official must have acted unnecessarily and wantonly for the purpose of inflicting harm.  See Farmer, 511 U.S. at 834.  Thus, to violate the Eighth Amendment, a prison official must have a "sufficiently culpable mind." See id.

When prison officials stand accused of using excessive force, the core judicial inquiry is ". . . whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." Hudson v. McMillian, 503 U.S. 1, 6-7 (1992); Whitley v. Albers, 475 U.S. 312, 320-21 (1986).  The "malicious and sadistic" standard, as opposed to the "deliberate indifference" standard applicable to most Eighth Amendment claims, is applied to excessive force claims because prison officials generally do not have time to reflect on their actions in the face of risk of injury to inmates or prison employees.  See Whitley, 475 U.S. at 320-21.  In determining whether force was excessive, the court considers the following

factors: (1) the need for application of force; (2) the extent of injuries; (3) the relationship between the need for force and the amount of force used; (4) the nature of the threat reasonably perceived by prison officers; and (5) efforts made to temper the severity of a forceful response. See Hudson, 503 U.S. at 7. The absence of an emergency situation is probative of whether force was applied maliciously or sadistically. See Jordan v. Gardner, 986 F.2d 1521, 1528 (9th Cir. 1993) (en banc). The lack of injuries is also probative. See Hudson, 503 U.S. at 7-9. Finally, because the use of force relates to the prison's legitimate penological interest in maintaining security and order, the court must be deferential to the conduct of prison officials. See Whitley, 475 U.S. at 321-22.

Deliberate indifference to a prisoner's serious illness or injury, or risks of serious injury or illness, also gives rise to a claim under the Eighth Amendment. See Estelle, 429 U.S. at 105; see also Farmer, 511 U.S. at 837. This applies to physical as well as dental and mental health needs. See Hoptowit v. Ray, 682 F.2d 1237, 1253 (9th Cir. 1982). An injury or illness is sufficiently serious if the failure to treat a prisoner's condition could result in further significant injury or the ". . . unnecessary and wanton infliction of pain." McGuckin v. Smith, 974 F.2d 1050, 1059 (9th Cir. 1992); see also Doty v. County of Lassen, 37 F.3d 540, 546 (9th Cir. 1994). Factors indicating seriousness are: (1) whether a reasonable doctor would think that the condition is worthy of comment; (2) whether the condition significantly impacts the prisoner's daily activities; and (3) whether the condition is chronic and accompanied by substantial pain. See Lopez v. Smith, 203 F.3d 1122, 1131-32 (9th Cir. 2000) (en banc).

The requirement of deliberate indifference is less stringent in medical needs cases than in other Eighth Amendment contexts because the responsibility to provide inmates with medical care does not generally conflict with competing penological concerns. See McGuckin, 974 F.2d at 1060. Thus, deference need not be given to the judgment of prison officials as to decisions concerning medical needs. See Hunt v. Dental Dep't, 865 F.2d 198, 200 (9th Cir. 1989). The complete denial of medical attention may constitute deliberate indifference. See

1 Toussaint v. McCarthy, 801 F.2d 1080, 1111 (9th Cir. 1986). Delay in providing medical
2 treatment, or interference with medical treatment, may also constitute deliberate indifference.
3 See Lopez, 203 F.3d at 1131. Where delay is alleged, however, the prisoner must also
4 demonstrate that the delay led to further injury. See McGuckin, 974 F.2d at 1060.

Defendants' motion is based largely on plaintiff's admissions at his deposition that excessive force was not used during the cell extraction and that, immediately after the extraction, he was "okay." A review of plaintiff's deposition testimony reflects the following exchanges:

> Q: During the cell extraction, okay, and this is from the time they [correctional officers] got there and putting in the gas grenade and going to the showers and being returned to your cell, do you allege that any correctional officer used any excessive force on you during that period?
>
> A: No.
>
> * * *
>
> Q: Did you ever tell any nurse that you were okay?
>
> A: Yeah.
>
> Q: Is that just before you went in [the shower after the extraction]?
>
> A: When I seen the nurse, I told her I feel okay.

The court does not see how these admissions could be any more clear. The court also does not see how these admissions don't fatally undermine plaintiff's case. Specifically, plaintiff admitted that no excessive force was used from the time he was first removed from his cell to the time he was returned to his cell and that he was "okay" following the cell extraction. Absent either excessive force or a serious medical need, it is impossible for plaintiff to prevail on his Eighth Amendment claims.

/ / /

/ / /

In his opposition, plaintiff argues that his deposition testimony should not be dispositive. Specifically, he contends that this lawsuit concerns excessive force used after he was returned to his cell and that counsel's question to him only covered the time period before he was returned to his cell. This argument, however, strikes the court as an attempt to recast the pleadings in order to avoid the effect of the admission he made at his deposition. The third amended complaint simply does not contain allegations of excessive force after plaintiff was returned to his cell. While he complains of missing property, he does not complain of excessive force used after he was returned to his cell.

Finally, the court must also agree with defendants that no § 1983 liability can lie against the supervisory defendants who did not personally participate in the cell extraction – specifically, defendants Felker and Foulk. Supervisory personnel are generally not liable under § 1983 for the actions of their employees. See Taylor v. List, 880 F.2d 1040, 1045 (9th Cir. 1989) (holding that there is no respondeat superior liability under § 1983). A supervisor is only liable for the constitutional violations of subordinates if the supervisor participated in or directed the violations. See id. The Supreme Court has rejected the notion that a supervisory defendant can be liable based on knowledge and acquiescence in a subordinate's unconstitutional conduct because government officials, regardless of their title, can only be held liable under § 1983 for his or her own conduct and not the conduct of others. See Ashcroft v. Iqbal, 129 S.Ct. 1937, 1949 (2009).

/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /

### IV.  CONCLUSION

Based on the foregoing, the undersigned recommends that Defendants' motion for summary judgment (Doc. 60) be granted.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within 14 days after being served with these findings and recommendations, any party may file written objections with the court.  Responses to objections shall be filed within 14 days after service of objections.  Failure to file objections within the specified time may waive the right to appeal.  See Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED:  February 10, 2011

*Craig M. Kellison*
**CRAIG M. KELLISON**
UNITED STATES MAGISTRATE JUDGE